1  Richard D. McCune (Bar #132124)
2  rdm@mccunewright.com
   David C. Wright (Bar #177468)
3  dcw@mccunewright.com
   Kristy M. Arevalo (Bar #216308)
4  kma@mccunewright.com
   MCCUNEWRIGHT LLP
5  2068 Orange Tree Lane, Suite 216
6  Redlands, California 92374
   Phone: (909) 557-1250 / Fax: (909) 557-1275
7
8  Attorneys for Plaintiffs
   SEONG BAI CHOI, CHRIS CHAN PARK, SANDRA REECH, DONALD
9  PRITCHETT, UN JIN CHOI, and MARYANN PARKER,
10 on behalf of themselves and all others similarly situated
11 *Additional counsel listed on next page
12
                 UNITED STATES DISTRICT COURT
13                CENTRAL DISTRICT OF CALIFORNIA
14
15 SEONG BAI CHOI, CHRIS CHAN PARK,      ) Case No.:  CV 09-08143 AHM (FMOx)
   SANDRA REECH, DONALD PRITCHETT,       )
16 UN JIN CHOI, and MARYANN PARKER, as   ) **PLAINTIFFS' NOTICE OF MOTION
   individuals and on behalf of all others ) AND MOTION FOR PRELIMINARY
17 similarly situated,                    ) INJUNCTION; MEMORANDUM OF
                                          ) POINTS AND AUTHORITIES IN
18             Plaintiffs,                 ) SUPPORT**
                                          )
19        v.                              ) **[Filed concurrently with Declaration of
                                          ) Richard D. McCune; Exhibits; [Proposed]
20 TOYOTA MOTOR CORPORATION;             ) Order]**
   TOYOTA MOTOR SALES U.S.A., INC.,      )
21 and DOES 1 through 10 inclusive.       ) Date:  March 8, 2010
                                          ) Time;  10:00 a.m.
22             Defendants.                ) Courtroom:  14
                                          )
23                                        ) Judge Assigned: A. Howard Matz
                                          ) Complaint Filed:  November 5. 2009
24                                        ) First Amended Filed:  January 18, 2010
25
26
27

-1-

Mitchell M. Breit, Esq. (*Pro Hac Vice* Application to be Submitted)
mbreit@hanlyconroy.com
Andrea Bierstein, Esq. (*Pro Hac Vice* Application to be Submitted)
abierstein@hanlyconroy.com
Jayne Conroy, Esq. (*Pro Hac Vice* Application to be Submitted)
jconroy@hanlyconroy.com
HANLY CONROY BIERSTEIN
SHERIDAN FISHER & HAYES LLP
112 Madison Avenue
New York, New York 10016-7416
Phone: (212) 784-6400
Fax: (212) 213-5949

Derek Y. Brandt, Esq. (*Pro Hac Vice* Application to be Submitted)
dbrandt@simmonsfirm.com
SIMMONS BROWDER GIANARIS
ANGELIDES & BARNERD LLC
707 Berkshire Boulevard
East Alton, Illinois 62024
Phone: (618) 259-2222
Fax: (618) 259-2251

Edward W. Choi, Esq. (Bar # 211334
edward.choi@calaw.biz
LAW OFFICE OF CHOI & ASSOCIATES
A Professional Corporation
3435 Wilshire Boulevard, Suite 2410
Los Angeles, California 90010
Phone: (213) 381-1515
Fax: (213) 233-4409

Daniel H. Chang, Esq. (Bar #
dchang@diversitylaw.com
Larry W. Lee, Esq. (Bar #)
lwlee@diversitylaw.com
DIVERSITY LAW GROUP, P.C.
444 South Flower Street, Suite 1370
Los Angeles, CA 90071
Phone: (213) 488-6555
Fax: (213) 488-6554

Attorneys for Plaintiffs
SEONG BAI CHOI, CHRIS CHAN PARK, SANDRA REECH, DONALD
PRITCHETT, UN JIN CHOI, and MARYANN PARKER,
on behalf of themselves and all others similarly situated

**TO THE COURT, ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on March 8, 2010 at 10:30 a.m., or as soon thereafter as this matter may be heard, in Courtroom 14 of the above-entitled Court, located at 312 N. Spring Street, Los Angeles, California 90012, Plaintiffs Seong Bai Choi, Chris Chan Park, Sandra Reech, Donald Pritchett, Un Jin Choi, and Maryann Parker, as individuals and on behalf of all others similarly situated will, and hereby do, move the Court pursuant to Federal Rules of Civil Procedure 65(a) and California Business and Professions Code §§ 17204 and 17535, to issue a preliminary injunction requiring Defendants to expand their current recalls of Toyota motor vehicles to include the 16 vehicle models for the indicated model years, as set forth in the Memorandum of Points and Authorities, that have experienced a high number of reported instances of sudden, unintended acceleration and to expand the recall to include the installation of a fail-safe brake over-ride mechanism for all vehicles included within such recalls.

Such preliminary injunction is warranted and the Court is empowered to issue it where, as here, Plaintiffs demonstrate "that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council*, __ U.S. ___ , 129 S. Ct. 365, 374 (2008). *See also Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009); *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009).

Dated: February 3, 2010.                    MCCUNEWRIGHT, LLP


                                             By:   /s/ *Richard D. McCune*
                                                   Richard D. McCune
                                                   Attorney for Plaintiffs

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ II

MEMORANDUM OF POINTS AND AUTHORITIES .................................................... 1

INTRODUCTION .................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 6

    Incidents of Sudden Unintended Acceleration ......................................... 6

        *Other Incidents of Unintended Acceleration* ............................... 9

    Toyota's Recalls ...................................................................................... 11

        *Floor Mat Recall* ........................................................................ 12

        *Brake –Pedal Recall and Brake Over-ride* .................................. 12

        *January 2010 Accelerator Pedal Recall* ..................................... 12

    Models and Model Years Involved ......................................................... 13

    Inclusion of the Fail-Safe Brake Over-Ride in the Recall........................ 13

    Plaintiffs' Claims .................................................................................... 14

LEGAL STANDARDS ............................................................................................ 14

ARGUMENT ........................................................................................................ 15

    I.    Plaintiffs Are Likely to Succeed on the Merits in their Claim for Injunctive Relief Under the California Unfair Competition Law ............ 15

    II.   Plaintiffs Will Suffer Irreparable Injury In the Absence of Preliminary Injunctive Relief ................................................................ 19

    III.  The Balance of Equities Tips in Favor of the Injunction ..................... 22

    IV.  The Injunction Plaintiffs Seek Is in the Public Interest ..................... 24

CONCLUSION ..................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**                                                                       *Page(s)*

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles,*
    559 F.3d 1046 (9th Cir. 2009) ........................................................15, 21, 22

*Bardin v. Daimlerchrysler Corp.,*
    136 Cal. App. 4th 1255, 39 Cal. Rptr. 3d 634 (2006) ............................17

*Barquis v. Merchants Collection Ass'n,*
    7 Cal. 3d 94, 101 Cal. Rptr. 745 (1972) ...............................................15

*Buller v. Sutter Health,*
    160 Cal. App. 4th 981, 74 Cal. Rptr. 3d 47 (2008) ...............................17

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,*
    20 Cal. 4th 163, 83 Cal. Rptr. 2d 548, 973 P.2d 527 (1999)................16

*Committee on Children's Television, Inc. v. General Foods Corp.,*
    35 Cal. 3d 197, 197 Cal. Rptr. 783 (1983) ...........................................15

*Dahl v. HEM Pharmaceuticals Corp.,*
    7 F.3d 1399 (9th Cir. 1993) ...................................................................20

*Daugherty v. American Honda Motor Co., Inc.,*
    144 Cal. App. 4th 824, 51 Cal. Rptr. 3d 118 (2006) .............................17

*Diamond Multimedia Systems, Inc. v. Superior Court,*
    19 Cal. 4th 1036, 80 Cal. Rptr. 2d 828 (1999) .....................................14

*Falk v. General Motors Corporation,*
    496 F. Supp. 2d 1088 (N.D. Cal. 2007).................................................17

*Golden Gate Restaurant Ass'n v. City and County of San Francisco,*
    512 F.3d 1112 (9th Cir. 2008)................................................................25

*Hansen Beverage Company v. Cytosport, Inc.,*
    2009 WL 5104260 (C.D. Cal. Nov. 4, 2009) ..................................22, 23

*Herr v. Nestle U.S.A., Inc.,*
    109 Cal. App. 4th 779, 135 Cal. Rptr. 2d 477 (2003) ..........................14

*In Re: Onstar Contract Litigation,*
    600 F. Supp. 2d 861 (E.D. Mich. 2009) ................................................17

*Independent Living Center of Southern California, Inc. v. Maxwell-Jolly,*
    572 F.3d 644 (9th Cir. 2009)..................................................................24

*Maxim Integrated Products, Inc. v. Quintana,*
    654 F. Supp. 2d 1024 (N.D. Cal. 2009)..................................................22

**Cases**                                                                 *Page(s)*

*Multimedia Patent Trust v. Microsoft Corp.*,
    525 F. Supp. 2d 1200 (S.D. Cal. 2007) ...................................................16

*Nelson v. NASA*,
    530 F.3d 865 (9th Cir. 2008) .........................................................22

*Norwest Mortgage, Inc. v. Superior Court*,
    72 Cal. App. 4th 214, 85 Cal. Rptr. 2d 18 (1999) ....................................14

*Orantes-Hernandez v. Smith*,
    541 F. Supp. 351 (C.D. Cal. 1982) ...............................................19, 20

*People ex rel. Mosk v. National Research Co. of Calif.*,
    201 Cal. App. 2d 765, 20 Cal. Rptr. 516 (1962) .....................................15

*Sammartano v. First Judicial District Court, in and for County of Carson* City,
    303 F.3d 959 (9th Cir. 2002) .........................................................24

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) .......................................................15

*Stringham v. Bick*,
    2007 WL 60996 (E.D. Cal. 2007) ..................................................20

*Sybersound Records, Inc. v. UAV Corp.*,
    517 F.3d 1137 (9th Cir. 2008) .......................................................16

*Winter v. Natural Resources Defense Council*,
    __ U.S. ___ , 129 S.Ct. 365 (2008) ..............................................15, 22

**Statutes**

Cal. Bus. & Prof. Code § 17200 .........................................................15

Cal. Bus. & Prof. Code § 17203 .........................................................15

Cal. Bus. & Prof. Code § 17204 ......................................................14, 15

Cal. Bus. & Prof. Code § 17535 .........................................................14

**Rules**

Fed. R. Civ. P. 65(a)....................................................................15

## INTRODUCTION

Plaintiffs – owners of cars and trucks manufactured and sold by defendants Toyota Motor Corporation and Toyota Motor Sales U.S.A., Inc. (together, "Toyota") – seek a preliminary injunction requiring Toyota to expand its current recall of Toyota motor vehicles (a) to include all model years of the 16 models that have experienced reported instances of sudden, unintended acceleration ("SUA") and have not been subject to the three recalls, (Listing of Non-Recall Model and Model Years, Ex. A to Motion; Listing of SUA Events in Recall and Non-Recall Models and Model Years, Ex. B to Motion); and (b) to include the installation of a fail-safe "brake over-ride" mechanism for all 16 models and model years that are not subject to the current brake-override recall, (Listing of Non-Brake Over-Ride Model and Model Years, Ex. C to Motion; Listing of SUA Events in Recall and Non-Brake Over-ride Recall Models and Model Years, Ex. D to Motion). This injunction is necessary to prevent imminent harm to Plaintiffs, the class they seek to represent, and the public from the Toyota cars and trucks that are at risk of SUA, which has resulted, and which in the absence of an injunction, will continue to result in numerous accidents, injuries, and fatalities.

In these 16 models alone, in the last nine years more than 1,200 owners of Toyota cars and trucks (Listing of all SUA Events by Model, Ex. E to the Motion.) have had the terrifying experience of sudden unintended acceleration, where their cars suddenly and for no apparent reason accelerated uncontrollably, sometimes to speeds of 100 miles per hour or more. These "runaway cars" have been responsible for at least 484 accidents, resulting in at least 11 deaths and over 210 injuries, including two recent high-profile incidents where entire families were killed when the family car took off at extraordinary speeds. In one incident, one of the passengers of a 2009 Lexus ES 350 being driven by an off-duty California Highway Patrol officer telephoned 911 and reported that the driver could not stop his vehicle, which accelerated to approximately 120 miles per hour before

launching off an embankment, where it crashed and burst into flames. All four family members in the car were killed. In an even more recent incident, four people in Southlake, Texas, died the day after Christmas when their 2009 Toyota Avalon inexplicably went through a T-intersection, crashed through a fence, hit a tree and landed upside down in a pond. Millions of Toyota owners who have not personally experienced the problem are now terrified to drive their cars, wondering if they will be the next victims.

Each of these 1,200 SUA events occurred with the subject 16 models that were equipped with Electronic Throttle Control System with Intelligence (ETCS-i). This is a system where the engine's throttle is controlled by electronic signals that are sent from a sensor that detects the position of the gas pedal to an electronic control module that determines how much throttle opening is being requested and in turn sends electronic signals to a throttle control motor that opens the throttle plate. Initially, this system was designed with a redundant mechanical linkage between the gas pedal and the engine throttle control as a failsafe in the event of SUA. (1998 Toyota Technical Video, Ex. 1 to Declaration of Richard D. McCune, ("McCune Decl.").) Beginning in or about 2001, Toyota removed the redundant mechanical linkage. (2002 Toyota Technical Video, Ex. 2 to McCune Decl.) Thereafter, Toyota owners had no mechanical fail-safe to prevent a malfunction that could cause a SUA.

The history of Toyota's response to the evidence of sudden unintended acceleration provides substantial support that Toyota has engaged in a campaign to conceal this safety issue from its customers. As illustrated in the timeline attached as Exhibit F to the Motion, for years Toyota simply denied the problem existed, as it received reports of hundreds of incidents of SUA each year. (Timeline of Toyota's Response to Evidence of Sudden Unintended Throttle Acceleration in ETCS-i Vehicles, Ex. F to the Motion.) When, in September 2009, Toyota finally acknowledged there was a problem, it claimed that the SUA events were caused by misplaced floor mats and

issued a floor mat-related recall. But after the floor mats in the Avalon involved in the Dallas incident were discovered in the trunk of the car, Toyota could no longer contain the problem or its explanation as to misplaced floor mats, if indeed there was any connection at all between the floor mats and the vast majority of SUA events. When that explanation was met with public skepticism, on November 25, 2009, Toyota expanded the floor mat recall to then claim the accelerator pedal design in combination with the floor mats was the culprit in the high number of sudden acceleration events.

In the face of increasing negative press, mounting lawsuits, customer outrage, and government investigations, on January 21, 2010, Toyota issued its largest recall to date, claiming anew that it had discovered yet another problem that it believed was the root of the sudden acceleration problem. On February 1, 2010, Toyota announced that it had not only discovered the root of the problem, but that it had developed a "comprehensive fix" for the SUA problem and that it would implement this fix on the vehicles subject to the January 21 recall. On February 1, 2010, Jim Lentz, president and chief operating officer of Defendant Toyota Motor Sales, Inc., stated on the NBC Today show that the two recalls would "stop what is going on" with the accelerators.

But, in fact, the so-called "comprehensive" fix is anything but a solution to the majority of owners who own Toyota models within the indicated model years that have experienced the reported sudden acceleration. Of the 17 models that experienced almost all of the over 1,200 SUA events reported to the National Highway Traffic Safety Administration ("NHTSA"), the pedal recall was limited to Toyota models and model years that were involved in only 20% of the reported SUA events. (Listing of Sticking Pedal Recall for Model and Model Years, Ex. G to Motion) The overlapping brake over-ride recall was almost as limited, as it only involved less than 25% of the Toyota models and model years that had experienced reported sudden acceleration events. (Ex. D to Motion). Only 43 of the over 1,200 SUA events occurred in models and model years included in any one of the three recalls. (Ex. B to Motion.) In summary, most of the

reported SUA's occurred in Toyota vehicle models and model years that were not included in any of the three Toyota recalls purporting to fix the problem of sudden unintended acceleration.

Toyota is thus misrepresenting to Plaintiffs, to the putative classes, and to the public that it has identified the problem; is fixing the problem; and that the three recalls would "stop what is going on," when, in fact, the vast majority of cars of the models and years that have experienced SUA events are not covered by the recalls.

Not only has Toyota failed to include all the affected models in its recall to fix the problem, it has also failed to include for over 75% of the model and model years affected by the 1,200 SUA's, the recall to provide a brake over-ride system that is the only true fail-safe to address this problem. The fail-safe "over-ride" system is a computer algorithm that directs the Electronic Throttle Control System ("ETCS-i") to automatically reduce the engine to idle when the brakes are being applied while the throttle is in an open position. While this over-ride cannot prevent SUA, it can and does prevent such acceleration from causing accidents because it allows the driver to bring the car safely to a halt simply by pressing the brake pedal. On November 25, 2009, following the outpouring of negative publicity arising from the high number of SUA incidents, Toyota announced that it would install the brake over-ride system for five of its existing models for select model years. It later announced it would begin installing the brake over-ride system on all new models. Inexplicably, Toyota chose to limit this vital fail-safe system to models and model years that account for less than 25% of the models and years that have exhibited a reported SUA in the NHTSA database for ETCS-i equipped vehicles.

The brake over-ride system is especially important because, while Toyota claims yet again that the latest fix solves the problem, this so-called "comprehensive" fix is the third time Toyota has announced that it has identified the source of the problem. Only time will tell if it has gotten it right this time. The majority of NHTSA complaints suggest otherwise. But, as Toyota is well aware, the brake over-ride system does not

depend on whether Toyota is correct about the source of the problem.  The fail-safe brake over-ride mechanism stops uncontrolled acceleration safely and prevents this dangerous occurrence from causing accidents and fatalities, *regardless of the underlying cause of the SUA*.  But, although Toyota has made this over-ride part of a recall applicable to a small number of models and all new models, it has refused to expand that recall to offer it for each and every Toyota model and model year that has a reported instance of SUA.

As explained in detail below, this Court should order Toyota to expand its recall to cover all of the affected models and model years and to offer the fail-safe brake over-ride for every affected Toyota model and model year.  Plaintiffs are likely to prevail on the merits of their claims. Through a series of recalls, Toyota has now partially acknowledged the problem of SUA that it should have remedied years ago, but instead, for years, concealed and failed to remedy.  Moreover, Toyota's conduct even now is deceptive, claiming that it is offering a "comprehensive" fix, but offering that fix only to a small minority of models and years that have been the subject of the SUA events. Toyota's conduct in concealing and failing to address this problem constitutes a fraudulent practice within the meaning of the Unfair Competition Law ("UCL"), California Business and Professions Code §§ 17200 *et seq.*, such that Plaintiffs are likely to prevail on their UCL claims.

It is also clear that Plaintiffs, the class they seek to represent, and the public at large, will suffer irreparable injury in the absence of this injunction. While Toyota offers partial fixes for some models and model years, additional incidents of SUA will certainly occur. Injuries and fatalities are the inevitable consequence of such additional incidents. Furthermore, millions of Toyota owners, dependent on their cars for transportation, are afraid to drive their cars and are put to the choice, every day, between risking their lives and safety, and the lives and safety of others by driving their cars, or doing without the transportation on which they depend.

Not only do Plaintiffs, putative class members, and the general public face irreparable injury if Toyota is not required to expand its recall, but, in addition, the balance of the equities clearly favors such an injunction. The fix already exists and has been offered for a limited number of models and model years. Toyota has already recalled millions of cars and stopped selling new ones while it tries to determine the source of the problem. But the fail-safe brake-override will work regardless of the source of the problem. Comparing this simple fix with the lives likely to be saved and the injuries likely to be averted shows that the equities clearly favor the injunction Plaintiffs seek.

Finally, this injunction is in the public interest. A runaway car is a danger not only to its driver and passengers, but to every other driver and passenger on the road, as well as to pedestrians and bystanders, any of whom may be injured or killed by a car that cannot be stopped or controlled. Only by expanding its recall to include all affected models and model years and to offer the fail-safe brake over-ride can Toyota protect the public from this dangerous defect in its cars and trucks.

STATEMENT OF FACTS

**Incidents of Sudden Unintended Acceleration**

Two high profile incidents of the four tragic deaths of the Mark Saylor family, (Toyota Press Release, August 28, 2009, Ex. 3 to McCune Decl.), and the equally as tragic four deaths in the Hardy vehicle, (Star Telegram Report, December 29, 2009, Ex. 4 to the McCune Decl.), have brought the problem of SUA to the attention of the public. However, while this issue is new to the public it is not new to Toyota. At least through public complaints to NHTSA, Toyota has been aware of the magnitude of this problem for years. For just the seventeen 2001 to 2010 Toyota and Lexus models that were equipped with ETCS-i, there were over 1,200 sudden throttle acceleration events reported. (Listing of all SUA Events by Model, Ex. E to Motion; Filtered Queries of 2001- 2010 NHTSA Complaints Database, Ex. 5 to Declaration of Richard D. McCune

["McCune Decl.]) This same database for these 17 models with ETCS-i, (Summary of ETCS-i Model and Model Years, Ex. A to motion; Supporting Documents for inclusion of ETCS-i vehicles; Ex. 6 to McCune Decl.), reflect that there have been reported 11 deaths, 210 injuries and 484 accidents caused by the unintended throttle acceleration, (McCune Decl. § 22; Ex. 5 to McCune Decl.). Those numbers are likely grossly understated for incidents and accidents caused by sudden unintended acceleration where the incident or accident is not reported or where the dealer indicates to the Toyota owner that there is not anything wrong with the vehicle.

While a few of the reported events could be explained away, a full reading of the descriptions of the runaway vehicles leaves little doubt of the magnitude of the problem. In addition, a high percentage of customers who reported the SUA events to NHTSA reasonably indicated that they had first reported the problem to Toyota and/or its dealers before contacting NHTSA. In addition to NHTSA complaints, there are numerous reported claims of SUA that have not been reported to NHTSA. All but one of the Plaintiffs has experienced SUA in his or her Toyota vehicle, with, fortunately, less tragic results.

Plaintiff Seong Bae Choi ("S. Choi") is the owner of a 2004 Toyota Camry that he purchased new from Longo Toyota, located in the city of El Monte, Los Angeles County, California. On numerous occasions, S. Choi experienced the vehicle undergo sudden unintended acceleration while in the process of applying his brakes, resulting in engine revving and forward lurching of the vehicle. S. Choi does not feel safe driving the vehicle. The 2004 Camry driven by S. Choi is not subject to any of the recalls of Toyota, including the brake over-ride recall, and is one of the vehicle model and years that have experienced an SUA and to which Plaintiffs seek to extend the remedy in this motion.

Plaintiff Sandra Reech ("Reech") is the owner of a 2008 Toyota Tacoma that was purchased new in April of 2008. On March 8, 2009, while accelerating to pass a slowing moving vehicle, the accelerator stuck wide open. Reech applied the brakes, and the

vehicle did not slow down. She then put all her weight on the brakes and shifted the vehicle into neutral. The engine continued to rev at very high rpm's. She was finally able to steer off the road and stop the vehicle. After the vehicle was turned off, Reech checked to see if the accelerator pedal was depressed and it was not. She checked the floor mats and they were not near the gas pedal or brake. The smell of overheated brakes was evident to her. Reech restarted the vehicle and the engine worked normally. She took the vehicle to the Toyota-Scion of Breensburg, Pennsylvania, dealership and reported the incident. The service representative was unable to determine a cause for the incident. Reech then contacted a Toyota representative who denied having heard of this type of problem. After she reported the incident to NHTSA, Reech spoke with another Toyota representative who advised her that the problem was caused by the floor mat, and refused to have a Toyota representative inspect the vehicle. Instead, the Toyota representative advised Reech that since she had demonstrated her ability to stop the vehicle, she should just continue driving the vehicle and if it happened again, she would know how to handle it.

Contrary to the assertions of Toyota's representative, Reech's incident was not caused by the floor mat or unintended depressing of the accelerator. Reech is now afraid to drive her Toyota because the vehicle is unsafe, and as a result it is parked in the driveway and she is deprived of the use of the vehicle because of her reasonable safety concerns. Reech's 2008 Tundra is not subject to the brake over-ride recall and is one of the vehicle model and years to which Plaintiffs seek to extend the brake over-ride recall remedy in this motion.

Plaintiff Donald Pritchett ("Pritchett") is the owner of a 2006 Toyota Tacoma. On October 7, 2009, while driving on U.S. Route 29 in West Point, Georgia, Pritchett's Toyota vehicle suddenly accelerated to a high rate of speed. Pritchett was able to avoid several obstacles before plowing into a ditch causing damage to the vehicle. The sudden acceleration occurred without Pritchett depressing the accelerator. It also was not caused

by the floor mat. Pritchett reported the sudden unintended acceleration to both the Toyota dealer and to Toyota's corporate representatives. After a vehicle inspection on which Pritchett insisted, Toyota denied there was any problem with the vehicle that caused the sudden unintended acceleration. Since the incident, Pritchett does not feel safe driving his Toyota. Pritchett's 2006 Tacoma is not subject to the brake over-ride recall and is one of the vehicle model and years to which Plaintiffs seek to extend the brake over-ride recall remedy in this motion.

Plaintiff Un Jin Choi ("U. Choi") is the owner of a 2004 Toyota Camry that she purchased new in California. On November 9, 2009, while operating the vehicle at slow speeds while preparing to park, U. Choi's Toyota suddenly accelerated. She swerved to avoid hitting a building, and the vehicle then sped across the street and struck a palm tree. U. Choi's Toyota had standard floor mats that were not trapped underneath the pedal. Since the incident, U. Choi does not feel safe driving the vehicle. U. Choi's 2004 Camry is not subject to any of the recalls of Toyota, including the brake over-ride recall, and is one of the vehicle models and years that have experienced an SUA and to which Plaintiffs seek to extend the remedy in this motion.

**Other Incidents of Unintended Acceleration**

The experiences of Plaintiffs are representative of a significant number of Toyota owners that have experienced this unexplained sudden and dangerous acceleration of their Toyota vehicle. Just the following sampling of complaints, illustrates the dangers and scope of the problem:

Plaintiffs have attached nine declaration of owners who are prospective class members (Declarations, Exs. 7-14, and 22 to McCune Decl.) who have experienced sudden acceleration similar to the class representatives and prospective class members. Those declarations demonstrate that what is being complained of extends over all models and model years of the subject vehicles, and the stories make real how dangerous and terrifying this is for Toyota owners.

For example, on November 28, 2009, Martin Wolk was driving his 2008 Lexus ES 350 in a parking lot at approximately 5 m.p.h. with his foot on the brake when the car suddenly rapidly accelerated and jumped the curb at the end of the parking space. Within seconds the car had traveled 25 feet and struck a tree with such force that the airbags deployed and both Mr. Wolk and his wife's legs were badly injured. (*See* Declaration of Martin Wolk, Ex. 22 to McCune Decl.) Even though the Toyota dealership replaced the accelerator pedal and installed new floor mats, Mr. Wolk remains concerned that this action did not correct the underlying problem and is afraid that it may happen again with even greater consequences.

Ute Dymon was driving her 2007 Lexus ES 350 on an interstate on-ramp when her car suddenly accelerated on its own from 35 to 40 m.p.h. to speeds of 80 to 85 m.p.h. Ms. Dymon applied the brake to try and slow her car but it continued to travel in excess of 80 m.p.h. as her brakes began to smoke. She continued trying to brake while avoiding cars and trucks on the interstate, at one point putting on her hazard lights to try and warn other vehicles. Fortunately, Ms. Dymon was able to maneuver her vehicle over to the shoulder, while still traveling 80-85 m.p.h., and managed to shift the car into neutral And bring it to a stop, with smoke and the smell of brakes heavy in the air. Ms. Dymon became physically ill for several days following the incident and remains afraid to drive to this day. Ms. Dymon reported the incident to Toyota, who responded that there was no problem with her car, stating specifically, "Based upon our inspection, it had been determined that this incident was not the result of any type of manufacturing defect with your vehicle." (*See* Declaration of Ute Dymon, Ex. 10 to McCune Decl.)

Toyota's response to reports of this type was exemplified in the case of Susan Chambers who, November 12, 2009, experienced sudden unintended acceleration in her 2005 Toyota Camry, while she was attempting to park her vehicle. Ms. Chambers had pulled over to the side of the road, had her foot on the brake, and was about to shift the transmission into park when the car accelerated like a rocket and slammed into a parked

-10-

car about one car length in front of her. She described the car as accelerating as if the accelerator were floored and the application of the brakes having no noticeable effect on the car.

She reported the incident to her local dealership who told her to report the incident to Toyota Motor Sales, U.S.A., Inc., which she did. She was told not to drive the car at all until it had been expected. After a Toyota representative eventually came to Kansas City to inspect the vehicle, he told her that it would take up to a month for Toyota to "make a decision." He then told her, however, that there was "nothing wrong" with the car and that he had taken some information from the car and driven it himself. After that, the Toyota dealership insisted that she immediately return her loaner car and take her own car back. When she asked the dealership to provide her a letter in writing assuring her that the car was safe to drive, they refused to do so. Approximately three weeks after the incident, Ms. Chambers received a letter from Toyota stating simply that "inspection of your vehicle revealed that it was in proper working. [sic]." Ms. Chambers is left with a vehicle that she is too afraid to drive, but too responsible to sell this unsafe car to someone else. (*See* Declaration of Susan Chambers, Ex. 12 to McCune Decl.)

These are, of course, just a representative sample of the thousands of Toyota owners who have experienced and reported incidents of sudden unintended acceleration, only to be told, in essence, that the car works fine and either the incident was imagined or was their own fault.

**Toyota's Recalls**

In response to the increasing negative publicity, lawsuits, concerned and unhappy customers and government investigations, Toyota has issued three recalls, each time indicating that it had discovered the problem, and none of which reached the vast majority of the affected models and model years.

**Floor Mat Recall**

On September 25, 2009, following the August 28, 2009, highly publicized tragic death of California Highway Patrol Officer Mark Saylor and three members of his family, Toyota announced the SUA problem was with mismatched floor mats and issued recalls to five Toyota models. (Toyota/Lexus Press Release, 9/29/2009, Ex. 15 to McCune Decl.)

**Accelerator Pedal Recall and Brake Over-ride**

Under mounting pressure on its responsiveness to this issue, on November 25, 2009, Toyota announced that, in addition to recalling the floor mats in five Toyota models, it would redesign the pedal configuration for certain model years for those models and three Lexus models, to make it less likely a floor mat would be trapped under the pedal. As part of this announcement, Toyota announced that for the 2007-2010 Camry, 2005-2010 Avalon, 2007-2010 Lexus ES 350, 2006-2010 Lexus IS 250, 2006-2010 Lexus IS 35 it would also install the brake over-ride system. (Toyota Press Release, 11/25/2009, Ex. 17 to McCune Decl.). But Toyota offered the fail-safe for all affected model years on only two models, the Avalon and the Lexus IS; for the rest, the fail-safe has been offered only for *some* of the affected years. The result is that the model and model years subject to the brake override recall comprise slightly less than 25% of the 16 model and model years that had experienced the SUA events. (Ex. D. to Motion.)

**January 2010 Accelerator Pedal Recall**

In response to what was up to that point a public relations nightmare for Toyota, it announced on January 21, 2010, that it was recalling certain of its vehicles due to a problem "when the pedal mechanism becomes worn". (Toyota Press Release, 1/21/2010, Ex. 17.) On February 1, 2010, Toyota went on a public relations campaign. It issued a press release stating that it had developed a comprehensive plan to fix the SUA. (Toyota Press Release, 2/1/2010, Ex. 18 to McCune Decl.) That same day, Toyota Motor Sales, Inc.'s president went on the NBC Today show and announced that the two recalls will

"stop what is going on" with the accelerators. Toyota has and continues to represent that the high incidents of SUA in its vehicles are fixed by the existing recalls.

**Models and Model Years Involved**

Plaintiffs request relief relating to sixteen models and model years that have experienced the vast majority of the SUA events but which Toyota has inexplicably omitted from its "comprehensive" recall. Those vehicles and model years are provided in a table attached as Exhibit A to this Motion. Exhibit C to the motion identifies the number of SUAs (total 1,234) involved with each of the models. Exhibit D to the motion identifies the number and percentage (less than 20%) of the models and model years covered by the pedal recall. Exhibit E to the motion identifies the number and percentage (less than 25%) of the models and model years covered by the brake over-ride recall. Exhibit F to the motion identifies the number and percentage (slightly less than 57%) of the models and model years not covered by any of the recalls.

These tables and calculations were performed in a four-step process. First, Plaintiffs have identified the models and model years that were equipped with ETCS-i (McCune Decl. § 6.) The next step was to identify the number of reported SUA events experienced by each of those ETCS-i models each model year. (McCune Decl. § 7.) The third step was to analyze the models and model years identified as having SUA events covered by the September 2009, November 2009, and January 2010, recalls. (McCune Decl. § 8.) The final step was preparation of the summary table attached as Exhibit A, which identifies the 16 models and model years to which Plaintiffs seek to expand the recall. (McCune Decl. § 9.)

**Inclusion of the Fail-Safe Brake Over-Ride in the Recall**

The brake-override system that Plaintiffs seek to add to the recall is neither novel nor unknown to Toyota: At least one competitor (and, Plaintiffs believe, likely more) has installed a brake over-ride system in its vehicles during this time frame. (*See* Audi's "The 2.7-litre Bi-turbo, Design and Function, Self-study Programme 198, Ex. 19 to

McCune Decl., at p. 39.)  However, most importantly, in November 2009, Toyota announced that it would install the brake over-ride system in *all* new vehicles and recalled a handful of existing models on the road for installation of the brake over-ride system.  (Toyota Press Release, 11/25/2009, Ex. 16 to McCune Decl.)  Based on these facts, it is clear that Toyota has the engineering capability to install the brake over-ride system on the sixteen models during the relevant model years which are all of vintages no earlier than 2001.

**Plaintiffs' Claims**

Plaintiffs filed this action on November 5, 2009, seeking injunctive relief and damages on behalf of nationwide and California-wide classes of persons who own Toyota or Lexus motor vehicles equipped with the ETCS-i system.[1]

### LEGAL STANDARDS

California Business and Professions Code §§ 17204 and 17535 permit injunctions to be sought by "any person acting for the interests of itself, its members, or the general public."  *See Herr v. Nestle U.S.A., Inc.*, 109 Cal. App. 4th 779, 789, 135 Cal. Rptr. 2d 477, 484 (2003).[2]  Courts have broad power to award injunctive relief, as the Legislature

---

[1] Relief under California law on behalf of a nationwide class is appropriate here because defendant Toyota Motor Sales, U.S.A., Inc. ("TMS") is, and, at all relevant times, was a California corporation with its principal place of business in Los Angeles County, California.  Further, policies relating to Toyota sales, maintenance, and recalls in the United States emanate from TMS headquarters in California, which also serves as the principal point of contact for customers complaining about the unintended acceleration problem. Accordingly, Plaintiffs' claims are based on conduct that occurred in California and are governed by the UCL regardless of where any particular plaintiff affected by that conduct happens to reside.  *See Diamond Multimedia Systems, Inc. v. Superior Court*, 19 Cal. 4th 1036, 80 Cal. Rptr. 2d 828 (1999); *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 85 Cal. Rptr. 2d 18 (1999).

[2] As noted below, the statute limits standing to pursue injunctive relief to any person "who has suffered injury in fact and has lost money or property as a result of the unfair competition. . . "  Cal. Bus. & Prof. Code § 17204.  There is no doubt that Plaintiffs here, owners of Toyota motor vehicles that have experienced incidents of SUA, have standing.

"intended . . . to permit courts to enjoin ongoing wrongful business conduct in whatever context such activity might occur."  *Barquis v. Merchants Collection Ass'n*, 7 Cal. 3d 94, 111, 101 Cal. Rptr. 745, 757 (1972); *see also Committee on Children's Television, Inc. v. General Foods Corp.*, 35 Cal.3d 197, 210, 197 Cal. Rptr. 783, 790-91 (1983).  Courts can protect the public's right to be protected from fraud and deceit and may enter injunctive relief on that basis alone.  *People ex rel. Mosk v. National Research Co. of Calif.*, 201 Cal. App. 2d 765, 771, 20 Cal. Rptr. 516, 520 (1962).

The Federal Rules of Civil Procedure authorize this Court to grant preliminary injunctive relief.  Fed. R. Civ. P. 65(a).  Preliminary injunctive relief is warranted where a plaintiff demonstrates "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Resources Defense Council*, __ U.S. ___ , 129 S. Ct. 365, 374 (2008). *See also Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009); *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009).

ARGUMENT

I. **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS IN THEIR CLAIM FOR INJUNCTIVE RELIEF UNDER THE CALIFORNIA UNFAIR COMPETITION LAW**

Plaintiffs are likely to succeed on the merits of their claim for injunctive relief under the UCL, Cal. Bus. & Prof. Code §§ 17200 *et seq.*  The UCL prohibits "any unlawful, unfair or fraudulent business act or practice. . . . ."  Cal. Bus. & Prof. Code § 17200.  To remedy such unfair, unlawful, or fraudulent practices, the UCL specifically provides that "[a]ny person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction."  Cal. Bus. & Prof. Code § 17203.  Moreover, the statute authorizes any person "who has suffered injury in fact and has lost money or property as a result of the unfair competition" to seek such an injunction.  Cal. Bus. & Prof. Code § 17204.

-15-

In *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999) the California Supreme Court confirmed the broad scope of the UCL to address unfair business practices. The Court held:

> [T]he unfair competition law's scope is broad. Unlike the Unfair Practices Act, it does not proscribe specific practices. Rather, as relevant here, it defines "unfair competition" to include "any unlawful, unfair or fraudulent business act or practice." (§ 17200.) Its coverage is sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law."

20 Cal.4th at 180, 83 Cal.Rptr.2d at 561. But the UCL does more than "borrow" from other laws: as the California Supreme Court explained in *Cel-Tech*:

> The statutory language referring to "any unlawful, unfair or fraudulent" practice . . . makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law. Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition-acts or practices which are unlawful, or unfair, or fraudulent. In other words, a practice is prohibited as "unfair" or "deceptive" even if not "unlawful" and vice versa.

*Id.*

Here, Plaintiffs allege that Toyota's conduct was fraudulent, because Toyota has known for years that its cars were especially prone to SUA, but has not only failed to disclose that fact to the public, but, indeed, until November, 2009, consistently denied it. Then once it had to acknowledge the problem, it has repeatedly misled its customers about the problem, the fix and which vehicles are experiencing the SUA problems. As the Ninth Circuit has recognized, fraudulent practices under the UCL "are ones where members of the public are likely to be deceived." *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1152 (9th Cir. 2008). The claim is broader than common law fraud and does not require a showing that plaintiffs were actually deceived; rather it is sufficient to show that "members of the public are likely to be deceived" by the practice. *Multimedia Patent Trust v. Microsoft Corp.*, 525 F. Supp. 2d 1200, 1217 (S.D. Cal. 2007). As the California Court of Appeals has explained:

> In order to state a cause of action under the fraud prong of the UCL a plaintiff need not show that he or others were actually deceived or confused by the conduct or business practice in question. The "fraud" prong of the UCL is unlike common law fraud or deception. A violation can be shown even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage. Instead, it is only necessary to show that members of the public are likely to be deceived.

*Buller v. Sutter Health*, 160 Cal.App.4th 981, 74 Cal.Rptr.3d 47 (2008).

In the context of defective cars, California courts recognize that the failure to disclose a defect with safety implications is a fraudulent practice within the meaning of the UCL. Thus, in *Falk v. General Motors Corporation*, 496 F.Supp.2d 1088 (N.D. Cal. 2007), the district court held that failure to disclose that certain GM cars had defective speedometers was fraudulent within the meaning of the UCL. Although the court held that failure to disclose a defect would constitute a fraudulent practice only when there was a duty to disclose, it further found that such a duty exists when the defect is material. The court noted that "a potential car buyer would view as material a defective speedometer" and further noted that "the potential for failed speedometers constitutes a safety hazard." 496 F.Supp.2d at 1096 & n.*. *Accord In Re: Onstar Contract Litigation*, 600 F. Supp. 2d 861 (E.D. Mich. 2009) (applying California law and noting that "when safety issues are presented, courts have sustained claims" under the UCL arising from automotive defects); *see also Daugherty v. American Honda Motor Co., Inc.*, 144 Cal.App.4th 824, 51 Cal.Rptr.3d 118 (2006) (where complaint was "devoid of factual allegations showing any instance of physical injury or any safety concerns posed by the defect," practice did not violate Consumer Legal Remedies Act and was not unfair under UCL)*; Bardin v. Daimlerchrysler Corp.*, 136 Cal. App. 4th 1255, 39 Cal. Rptr. 3d 634 (2006) (where "[p]laintiffs did not allege any personal injury or safety concerns related to DCC's use of tubular steel exhaust manifolds" rather than more expensive cast iron, practice did not violate UCL).

Here, there can be no doubt that the defect in Toyota motor vehicles raises serious safety concerns: in just the 17 models identified, and excluding fatalities where SUA is suspected, but not confirmed, 11 people have already died and hundreds of others have been injured as a result of SUA. Indeed, compared to the defect at issue in *Falk* -- speedometers that failed – the tendency of a vehicle to accelerate without warning and fail to respond to the brakes is far more dangerous. Moreover, the evidence shows that incidents of SUA have been reported to Toyota for at least 8 years but until the fall of 2009, Toyota never acknowledged the problem and indeed, repeatedly denied it. Toyota's mislabeling of the scope of its current recall as "comprehensive," along with Toyota's refusal, even now, to make its cars safe by providing the fail-safe brake over-ride to ensure that SUA does not continue to cause property damage, bodily injury, and death constitutes a continuation of Toyota's fraudulent business practice within the meaning of the UCL. Not only are Plaintiffs likely to succeed on their claims under the UCL, establishing that Toyota has engaged in unlawful, unfair and fraudulent conduct with respect to the sudden, unintended acceleration of its cars, but, in addition, Plaintiffs are likely to establish their right to injunctive relief requiring Toyota to provide the same "comprehensive fix", which must include the fail-safe brake-override fix in the 16 models and model years that comprised 75% of the SUA events that were not included in the recall, and for the models and model years that comprised 80% of the SUA events yet were not included in the pedal recall.

Toyota has now claimed on three separate occasions to have identified the source of the sudden unintended acceleration of its cars and trucks. Each time it has provided a different root cause. Plaintiffs and the members of the class should not be subject to the changing winds of Toyota's different theories and varying fixes without at least being

protected if a SUA event occurs in their vehicle.[3] The fail-safe brake over-ride protects drivers of Toyotas in the event of sudden unintended acceleration *regardless of the underlying cause of the acceleration*. It is the only fix that is guaranteed to promote public safety because it is the only fix available that does not depend on the accuracy of any particular theory of the underlying cause of the problem.

## II. PLAINTIFFS WILL SUFFER IRREPARABLE INJURY IN THE ABSENCE OF PRELIMINARY INJUNCTIVE RELIEF

It is clear that, in the absence of the preliminary injunctive relief they seek, Plaintiffs, the members of the putative class, and the public at large will suffer irreparable injury. This injury is of two types, in the alternative. First, without the fail-safe brake over-ride, additional instances of sudden, unintended acceleration (of which there have already been thousands and thus, predictably, there are likely to be more) may lead to auto accidents involving damage to property, injuries to drivers, passengers, pedestrians and/or bystanders, and even fatalities. There have already been at least 19 deaths associated with sudden, unintended acceleration of Toyota and Lexus cars and trucks. In the absence of the fail-safe brake over-ride, there are likely to be additional such fatalities – the ultimate irreparable injury.

It is clear that a petitioner makes out a showing of irreparable harm where his physical health or well-being is or might be compromised failing issuance of the injunctive relief sought. In *Orantes-Hernandez v. Smith*, 541 F.Supp. 351 (C.D. Cal. 1982), the plaintiff class of Salvadoran refugees satisfied the irreparable harm element of the analysis in that they faced removal to El Salvador absent relief. This Court took judicial notice of the violent conditions in El Salvador and judged that "removal to a

---

[3] It is worth noting that Toyota's most recent explanation for the SUA problem points to corrosion or degradation of the accelerator pedal assembly, which Toyota says is exacerbated over time. No portion of the recall includes the older models.

country overrun with civil war and violence may lead to an injury which is irreparable in the most literal sense of the word." *Id.* at 372. Risk of adverse impact on an applicant's physical well-being also amounted to irreparable harm in *Stringham v. Bick*, 2007 WL 60996 (E.D. Cal. 2007), *report and recommendation adopted by Stringham v. Bick*, 2007 WL 806619 (E.D. Cal. 2007). In granting the petitioner's request for a preliminary injunction seeking altered conditions of incarceration the district court noted as a sufficient showing of irreparable harm, among other things, the petitioner's migraine headaches and need for access to bathroom facilities of a specific type. *Id.* at *13. The *Stringham* court also likened the physical harm issue to *Dahl v. HEM Pharmaceuticals Corp.*, 7 F.3d 1399 (9th Cir. 1993), as being "the case most nearly analogous to the instant matter, in that the subject of physical health was at issue[.]" 2007 WL 60996 at *10. In *Dahl*, *supra*, the Ninth Circuit upheld mandatory injunctive relief granted to the plaintiffs, who sought to enforce the defendant pharmaceutical company's promise that it would provide the plaintiffs with twelve months' worth of an experimental drug for which the plaintiffs had taken part in an experimental test program relating to the treatment of their medical condition.

Second, many Toyota owners are afraid to drive their cars and, in order to avoid risking their own safety and that of others, simply will not drive their cars without some kind of safety mechanism to ensure that sudden unintended acceleration will not turn into another Saylor family tragedy. Loss of use of their cars constitutes irreparable injury, because for many individuals, their Toyota car or truck is their only means of transportation. Without it, they cannot get to work, do their grocery shopping, or otherwise go about their daily lives. Loss of use of the car – and the awful, unpalatable choice between getting to work or to the grocery store, on the one hand, and not driving the car, in order to avoid the risks of uncontrollable unintended acceleration, on the other – also constitutes irreparable injury. The Ninth Circuit has recognized that such a Hobson's choice, where a very real harm will apply to the Toyota owners no matter

which way they choose to proceed, represents irreparable harm.  *See Am. Trucking Assns., Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057-1059 (9th Cir. 2009) (petitioners forced to make choice between signing what were likely unconstitutional concession agreements and refusing to sign agreements, and thereby risking goodwill and business, had shown likelihood of irreparable harm).

Plaintiffs will suffer this irreparable injury in the absence of the injunction they seek because the recalls that Toyota has issued do not cover all of the models and model years that are prone to this problem. In particular, they do not cover the vast majority of the models and model years in which the sudden throttle acceleration event occurred and which are the subject of this motion.

Nor, it should be obvious, will relief at the end of this lawsuit suffice.  Every day of delay in offering the fail-safe brake over-ride puts additional persons at risk from incidents of unintended acceleration and puts all Toyota owners to the difficult choice of foregoing use of their cars or risking life and limb to drive them.  A fix in six months simply will not protect Plaintiffs, the members of the putative class, and the public at large, to the same extent as a fix now.

Similarly, money damages at the end of the case cannot adequately compensate Plaintiffs, the members of the putative class, or the public at large. That such damages will not make up for bodily injuries or fatalities is, of course, self-evident.  But it is also true that damages later will not compensate Toyota owners for loss of use of their cars now.  Some owners, to be sure, may be able to afford to buy a new car immediately, without selling or otherwise trading in their Toyotas. But such owners are in the minority. Automobiles are expensive.  Without hardship, most car owners simply cannot afford to replace their cars unless they can be relieved of their existing car loans or leases and/or realize some of the value in their cars.  These persons cannot mitigate their damages by buying new cars now or by taking taxi cabs for all of their transportation needs until such time as Toyota provides them with a damages remedy or an appropriate fix. Nor can they

reasonably be expected to simply "trade in" their dangerously defective vehicles. As one declarant explains:

> I am too afraid to drive this car. I would like to get rid of it, but I would feel guilty to "dump" this unsafe car on the market. So what am I to do? I have an unsafe car, and no one at Toyota will help me.

(Chambers Decl. ¶29, Ex.12 to McCune Decl.)

Even though monetary injuries generally are not considered irreparable, a plaintiff who is forced to give up the means of transportation now, in exchange for monetary recompense at some unknown point in the future, also risks the ability to care for one's family and attend to the necessities of everyday life, not the least of which being the ability to hold employment. Emotional damages and stress cannot be compensated through mere back-payment of losses. *Am. Trucking Assns*., 559 F.3d at 1059 (*citing Nelson v. NASA*, 530 F.3d 865, 881-882 (9th Cir. 2008)). To the extent most plaintiffs will not be able to absorb these costs, thus being coerced into accepting the risk of driving unsafe vehicles, this, too, amounts to irreparable harm. *See id.*

## III.   THE BALANCE OF EQUITIES TIPS IN FAVOR OF THE INJUNCTION

In balancing the equities, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 129 S. Ct. at 376. In so doing, the court "will look to the possible harm that could befall the various parties." *Maxim Integrated Products, Inc. v. Quintana*, 654 F.Supp.2d 1024 (N.D. Cal. 2009). As a court in this district has explained:

> [T]he court must identify the harm that a preliminary injunction might cause the defendant and weigh it against plaintiffs' threatened injury. '[T]he real issue in this regard is the degree of harm that will be suffered by the plaintiff or the defendant if the injunction is improperly granted or denied.

*Hansen Beverage Company v. Cytosport, Inc.*, 2009 WL 5104260, *24 (C.D. Cal. Nov. 4, 2009) (internal citations omitted). Where the harm that a plaintiff would suffer in the absence of an injunction is irreparable, and the harm the defendant would suffer if any

injunction were improperly granted is purely financial and compensable, the balance of the equities favors the injunction. *Id.*

This balancing analysis has been embraced by Toyota's recent announcements explicitly recognizing that the balance of equities favors public safety over any inconvenience to Toyota. In the *New York Times'* full page statement to the public, published in the February 2, 2010, edition, Toyota's President and Chief Operating Officer Jim Lentz, concedes that point:

> Some of the actions we've taken are unprecedented. Stopping production is never an easy decision – but we're confident it's the right thing to do for our customers.
>
> Ensuring your safety is our highest priority. We'll continue to do everything we can to meet – and exceed – your expectations, and justify your continued trust in Toyota.

(Toyota Motor Sales, U.S.A., Inc.'s Open Letter to Customers, 2/2/2010, Ex. 20 to McCune Decl.)

It is beyond cavil that while Plaintiffs and the public have but little choice other than to risk driving vehicles which may at any given moment careen rapidly out of control, or to simply not drive their cars and be left without adequate transportation. Toyota may easily ask affected owners to bring their vehicles into dealerships for repair, and indeed it has already begun to do precisely that. Plaintiffs ask only that Toyota expand the recall it is already doing to cover all affected models and to include the brake over-ride it is already offering for five models. On balance, any inconvenience of this expansion is more than outweighed by the very serious risk to public safety.

The injunction Plaintiffs seek will not, in fact, cause any material harm to Toyota. While it is true that it will cost Toyota money to recall the vehicles at issue and make them safe - and the only cost at issue is the *marginal* cost of adding the rest of the models and the brake over-ride fix to the existing recall – it is obligated to make this fix anyway and that cost is likely to pale in comparison to the costs it will certainly incur in the event

-23-

that it fails to make these vehicles safe, such as the cost of defending and paying judgments and settlements in lawsuits arising from future SUA accidents.

Furthermore, the cost of making these vehicles safe must be considered in light of the harm to Toyota's reputation and goodwill that it already has suffered, and will continue to suffer, if it fails to make these vehicles safe as compared with the benefits to its reputation and goodwill if it acts promptly to "do the right thing." Declarant Susan Chambers, for example, has been a loyal Toyota customer for over 30 years. She declares:

> I have tried to get some relief from Toyota, but on those occasions when I have actually been able to get any human being on the telephone, they have been extremely nasty to me, have refused to discuss this with me, and have refused to do anything, stating that this is "not our problem."

> I am too afraid to drive this car. I would like to get rid of it, but I would feel guilty to "dump" this unsafe car on the market. So what am I to do? I have an unsafe car, and no one at Toyota will help me.

(Chambers Decl. ¶¶ 28-29, Ex. 12 to McCune Decl.)

On balance, the harm to Toyota of complying with this injunction is clearly outweighed by the irreparable injury to Plaintiffs, the class members, and the general public if the injunction is not granted.

## IV. THE INJUNCTION PLAINTIFFS SEEK IS IN THE PUBLIC INTEREST

The injunction Plaintiffs seek is also in the public interest. Where the public interest is involved, the court must determine whether the public interest favors the grant of the injunction. *Sammartano v. First Judicial District Court, in and for County of Carson* City, 303 F.3d 959, 965 (9th Cir. 2002). As the Ninth Circuit has explained, "The public interest inquiry primarily addresses impact on non-parties rather than parties." *Id.* at 974. In particular, the court must "consider whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Independent Living Center of Southern California, Inc. v. Maxwell-Jolly*, 572 F.3d 644 (9th Cir. 2009).

-24-

1    Indeed, the Ninth Circuit has specifically recognized the public's interest in health

2    and safety.  *See Golden Gate Restaurant Ass'n v. City and County of San Francisco*, 512

3    F.3d 1112, 1126 (9th Cir. 2008) ("the general public has an interest in the health of San

4    Francisco residents and workers, particularly those workers who handle their food and

5    work in other service industries."). Here, the non-parties that will be affected by the

6    injunction are drivers, passengers, pedestrians, and by-standers who are not Toyota

7    owners but who are at risk of injury caused by SUA of someone else's Toyota.  Clearly,

8    the requested preliminary injunction is in the interest of these persons and, equally

9    clearly, there is *no* public interest that would be injured by the grant of preliminary relief

10   here.

### CONCLUSION

11

12   For the foregoing reasons, this Court should grant the preliminary injunction

13   requested and order Toyota to extend the scope of its recall to all models and model years

14   affected by SUA and to implement the fail-safe brake over-ride to all vehicles in the

15   recall.

16   Dated:  February 3, 2010.               **MCCUNEWRIGHT LLP**

17

18                                          By:   /s/ *Richard D. McCune*
                                                 Richard D. McCune
19                                               Attorney for Plaintiffs

20

21

22

23

24

25

26

27